INFRA–PAK (DALLAS), INC.,
Plaintiff-Appellant,
Cross-Appellee,

v.

CARLSON STAPLER & SHIPPERS
SUPPLY, INC., Defendant-Appellee,
Cross-Appellant.

No. 85–1571.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1986.

Raymond R. Fernandez, Jr., Evans, Fernandez, Forgerson & Hurwitz, Dallas, Tex., for plaintiff-appellant, cross-appellee.

Kevin J. Cook, DeHay & Blanchard, Gary D. Elliston, Dallas, Tex., for defendant-appellee, cross-appellant.

Before GEE, RANDALL and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Infra-Pak, Inc., (Infra Pak) manufactures automatic industrial stretch wrapping machines. Appellee, Carlson Stapler & Shippers Supply, Inc., (Carlson) is a distributor of Infra-Pak machines. In this Texas diversity case, Infra-Pak sued Carlson for $17,250 due on the purchase price of two wrapping machines. Carlson counterclaimed for a like amount it claimed for assisting Infra-Pak in making an unrelated sale. A jury found Carlson was entitled to only $14,550 as compensation for assisting Infra-Pak and judgment was entered against Carlson for $2,700. Both parties appeal. We find no error and affirm.

## I.

Infra-Pak named Carlson a distributor of its wrapping machines. Under the non-exclusive distributorship contract confected between the parties, Carlson was given the right to purchase the wrapping machines for a 15% discount off the list price; Carlson then sold the machines for the full list price to its customers.

In September 1981, Carlson learned that Liberty Glass Company (Liberty) was in the market for an automatic stretch wrapping machine. Carlson sales personnel visited Liberty and attempted to persuade Liberty to purchase an Infra-Pak machine. Following this meeting, Liberty personnel, accompanied by Carlson salesmen, visited Infra-Pak's Dallas manufacturing plant.

After Liberty's visit to Infra-Pak, Carlson sales representatives made follow-up sales calls on Liberty two to four times per month as well as frequent telephone calls. Between January and May 1982, Carlson gave three separate quotes to Liberty for the Infra-Pak Spider Automatic Ten stretch wrapping machine, ranging from $96,000 to $100,000, but Carlson was not able to close the sale.

In September 1982, Liberty contacted Infra-Pak to inquire about a different machine called a Super Spider stretch wrapping machine. Liberty informed Infra-Pak it would make the purchase only from Infra-Pak and not through a distributor. Infra-Pak submitted a $110,000 quote to Liberty for the Super Spider and made a direct sale to Liberty in October 1982. Infra-Pak never informed Carlson of the direct sale.

In November 1982, Carlson purchased two smaller stretch wrapping machines on credit from Infra-Pak for a total of $21,-267.50. After Carlson discovered that Infra-Pak had made the direct sale to Liberty, and had not offered to pay it a commission, Carlson refused to pay Infra-Pak the purchase price of these two machines.

In January 1983, Carlson and Infra-Pak met to attempt to settle the dispute. Carlson claimed it was entitled to a $17,250 commission on Infra-Pak's direct sale to Liberty. Infra-Pak disagreed. Carlson refused to pay for the two machines it purchased until its commission was paid.

Carlson sent Infra-Pak a check for $4,017.50, the difference between the $21,-267.50 purchase price for the two Infra-Pak machines Carlson purchased on credit and the $17,250 Carlson claimed it was owed as a commission on Infra-Pak's direct sale to Liberty Glass. Infra-Pak negotiated this check and sued Carlson for the $17,250 balance. Carlson filed a counterclaim, claiming that: "[T]he $4,017.50 it paid Infra-Pak was in accord and satisfaction of its entire debt for the two machines; it was entitled to set off the $17,250 as a commission on the Liberty sale." A jury agreed in principle with Carlson on both counts. It determined that the $4,017.50 Carlson paid Infra-Pak was in full settlement of Infra-Pak's claim. It also determined that Carlson was entitled to recover under its quantum meruit counterclaim but fixed the reasonable value of Carlson's services at $14,-550.

Infra-Pak moved for judgment notwithstanding the verdict. The district court granted this motion with respect to the jury's finding of an accord and satisfaction, but the court refused to disturb the jury's finding that Carlson was entitled to $14,550 in quantum meruit compensation. The final judgment required Carlson to pay Infra-Pak $2,700: the difference between the $17,250 remaining due for the two machines Carlson purchased from Infra-Pak and the $14,550 compensation the jury found Carlson earned for its efforts in assisting Infra-Pak in the Liberty sale. On appeal, Infra-Pak contends the district court erred in allowing the jury to consider Carlson's claim for compensation predicated on a quantum meruit theory because: (1) any services Carlson rendered were covered by the express distributorship contract; (2) Carlson's sales efforts were not the "producing cause" of the Liberty sale; (3) the jury instructions and interrogatories were improper; and (4) the evidence is insufficient to support quantum meruit recovery. Infra-Pak also contends that the damage award is excessive and the district court erred in calculating pre-judgment interest. Carlson cross-appeals, contending the district court erred in granting JNOV on the accord and satisfaction issue.

## II.

### A.

■ Recovery under quantum meruit is premised "on the principle of equity that a party deserves to be paid for the services or materials he furnishes. A person should be compensated for his efforts when an express contract does not provide recovery for the reasonable value of the services rendered and accepted." *Wood v. Texas Farmers Insurance Co.*, 593 S.W.2d 777, 781 (Tex.Civ.App.1979, no writ) (citation omitted). Texas law precludes quantum meruit recovery, however, if the recovery sought is the subject of an enforceable contract. *Woodward v. Southwest States, Inc.*, 384 S.W.2d 674, 675 (Tex.1964). To determine whether performance of certain tasks is outside the scope of an express contract, Texas courts consider: (1) whether the work was extra; and (2) whether the contract makes provision for the extra work performed. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 86 (Tex.1976). Infra-Pak argues that Carlson has failed to satisfy this test because the distributorship agreement expressly provides for the work Carlson performed in connection with the Liberty sale.

We are persuaded that the work Carlson performed was extra work for which the distributorship agreement made no provision. No provision is made that requires or permits Carlson to assist Infra-Pak in making direct sales; similarly, no provision is made for compensation to Carlson for such assistance. The distributorship agreement simply contemplated that Infra-Pak would sell wrapping machines to Carlson at a discount and Carlson would then sell them to its customers at the list price. Infra-Pak points to a provision of the distributorship agreement that requires Carlson to "use its best efforts to promote, market, and sell INFRA PAK products." Infra-Pak contends this provision addresses the type of services Carlson performed in promoting the Liberty sale. We disagree and inter-

pret this provision as simply requiring Carlson to use its best efforts as a distributor to promote and market machines that it has purchased from Infra-Pak. We agree with the district court that the distributorship agreement did not provide for the services for which Carlson claimed compensation.[1]

### B.

■ The jury found that Carlson's efforts were not a "producing cause" of the sale of the Super Spider machine to Liberty. The district court instructed the jury that "producing cause" meant "an efficient or contributing cause which, in a natural sequence, unbroken by any new and independent cause, produced the sale in question."[2] Infra-Pak contends Carlson is not entitled to quantum meruit recovery because it was not the producing cause of the Liberty sale. To support its contention, Infra-Pak relies on real estate brokerage cases that hold that where a brokerage contract is unenforceable, a broker must be the producing or procuring cause of the sale to be entitled to quantum meruit recovery. *Green v. Gladden*, 369 S.W.2d 69 (Tex.Civ.App.1963, no writ); *Page v. Estes*, 142 S.W.2d 292 (Tex.Civ.App.1940, dism. judgm. cor.); *Lane v. Davidson*, 31 S.W.2d 1094 (Tex.Civ.App.1930, no writ).[3]

The Supreme Court of Texas' most recent statement on quantum meruit sets forth four elements: (1) valuable services were rendered; (2) for the person sought to be charged; (3) which were accepted and enjoyed; (4) under circumstances giving reasonable notice that compensation was expected for the services. *Bashara v. Baptist Memorial Hospital System*, 685 S.W.2d 307, 310 (Tex.1985). Under this test, quantum meruit recovery is possible for any valuable services rendered. In the most analogous quantum meruit sales distributorship case we have found, no producing or procuring cause requirement is discussed or imposed. *Mitsubishi Aircraft International, Inc. v. Maurer*, 675 S.W.2d 286, 288 (Tex.App.1984, no writ); *see also Kendall v. Plastic Engineering & Sales Corp.*, 350 S.W.2d 661 (Tex.Civ.App.1961, writ ref'd.); *cf. Corporate Personnel Consultants v. Wynn Oil Co.*, 543 S.W.2d 746 (Tex.Civ.App.1976, no writ).

The above cases are factually more analogous to the instant case than decisions involving real estate brokers. Although no explanation is offered by the Texas courts for the peculiar treatment of real estate brokers, Carlson was not a real estate broker and we do not apply those cases here. We conclude that the district court correctly held that Carlson need not establish that his services were a procuring or producing cause of the sale to be entitled to a quantum meruit recovery.

### C.

■ Infra-Pak next contends the evidence is insufficient to support Carlson's quantum meruit recovery because Carlson promoted the sale of a different machine than the one Liberty actually purchased. But the jury was entitled to find Carlson's efforts in promoting the Automatic Ten machine were helpful to Infra-Pak in selling the Super Spider machine to Liberty. The jury was entitled to find from the evidence that Carlson introduced Liberty personnel to Infra-Pak personnel; Carlson persuaded Liberty personnel to visit the Infra-Pak factory to take a close look at the manufacture of the Spider Automatic Ten machine; Carlson made several follow-up sales calls on Liberty to reinforce its earlier efforts to sell the Infra-Pak ma-

---

1. Infra-Pak's contention that this question should have been submitted to the jury is meritless. The interpretation of the contract is a question of law.

2. This definition directly corresponds to the definition of "procuring cause" in Texas. Apparently the two terms are interchangeable. See 10 Tex.Jur.3d § 38 (1980).

3. Infra-Pak concedes that Texas has modified this area of law by statute and that real estate brokers are no longer entitled to quantum meruit recovery under any circumstances. Real Estate License Act, Vernon's Ann.Civ.St. Art. 6573a, § 20b, Tex.Rev.Civ.Stat.Ann.; *Sherman v. Bruton*, 497 S.W.2d 316, 321 (Tex.Civ.App.1973, no writ).

chine.[4] The evidence supports Carlson's recovery on a quantum meruit theory.

■ Infra-Pak also contends the $14,550 damage award is excessive. The measure of quantum meruit recovery is the reasonable value of the services rendered. *Wood,* 593 S.W.2d at 781. The recovery awarded is not excessive in light of the services detailed above that Carlson rendered.

### D.

■ The jury found that Carlson's payment of $4,017.50 to Infra-Pak was in accord and satisfaction of Carlson's entire debt for the two machines it purchased on credit. The district court granted Infra-Pak's JNOV motion on this finding and Carlson's cross-appeal raises the propriety of that ruling.

A creditor's acceptance of a check in an amount less than a disputed dollar claim does not automatically discharge the entire debt. *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454 (Tex.1970). To constitute an accord and satisfaction, the debtor must clearly communicate that he is tendering the smaller payment to the creditor in full satisfaction for the entire debt. *Ambox, Inc. v. Stewart & Stevenson Services, Inc.,* 518 S.W.2d 428 (Tex.Civ.App.1975, writ ref'd. n.r.e.). The check Carlson tendered was an amount it conceded was due over and above its claimed commission. No clear statement was made on the check or attached to it that the check was in full settlement of all claims. We therefore conclude that the district court did not err in granting Infra-Pak's motion for JNOV.

### E.

■ The district court entered judgment against Carlson for $2,700, the difference between the $17,250 it withheld from the purchase price of the two Infra-Pak machines and the $14,550 the jury found Carlson was entitled to recover from Infra-Pak. The district court awarded prejudgment interest to Infra-Pak on this $2,700. Infra-Pak argues that the district court should have awarded prejudgment interest on its entire $17,250 recovery as provided in the distributorship agreement. Infra-Pak principally cites a Nebraska case that applies an exception to the general rule of only awarding prejudgment interest on the balance of claims. *See Socony Mobil Oil Co. v. Klapal,* 205 F.Supp. 388, 391 (D.Neb.1962).

Texas law gives the trial judge discretion to deduct the amount of a set-off before calculating prejudgment interest. *Rio Grande Valley Sugar Growers v. Campesi,* 580 S.W.2d 850, *rev'd on other grounds,* 592 S.W.2d 340 (Tex.1979); *Cage Brothers v. Cage,* 382 S.W.2d 169, 172–73 (Tex.Civ. App.1964, writ ref'd. n.r.e.). To prevent the unjust enrichment of Infra-Pak, the district court did not abuse its discretion in deducting the set-off and awarding prejudgment interest only on the remaining $2,700.

AFFIRMED.

RANDALL, Circuit Judge, dissenting:

I respectfully dissent.

The majority opinion correctly and concisely states the Texas law on recovery under quantum meruit. I differ with the majority on the application of that law to the facts of this case. The right to recover in quantum meruit is based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted. If a valid express contract covering the subject matter exists, there can be no recovery under quantum meruit. The existence of an express contract, however, does not preclude recovery in quantum meruit for the reasonable value of the services rendered and accepted which are not covered by the contract. The central issue, then, is whether the work performed by Carlson was within the scope of its non-exclusive distributorship contract with Infra-Pak. That agreement requires Carlson to "use its best efforts to promote, market, and sell Infra-Pak products."

---

**4.** It follows that the district court committed no error in declining to instruct the jury that Carlson could only recover for assistance rendered in the sale of the Super Ten machine.

The majority interprets this provision narrowly as simply requiring Carlson to use its best efforts as a distributor to promote and market machines that it *has already purchased* from Infra-Pak. In my view, this limitation of Carlson's distributorship obligations is not supported by the plain language of the contract or by common sense. To me, it makes less sense to interpret the broad language of the agreement as imposing upon Carlson a requirement to use its best efforts to promote and market only those machines that it has already purchased than it does to interpret that language as requiring Carlson to use its best efforts to promote, market and sell Infra-Pak products generally.

This contract, besides defining Carlson's work obligation, also covers Infra-Pak's right to sell directly to customers. The contract specifically gives Infra-Pak "the right to sell to others at wholesale, retail and otherwise." The contract, on its face, thus provides for Infra-Pak to sell directly to a customer, even though Carlson may have used its best efforts to close a sale with the same customer. The possibility that Carlson might work diligently on a sale, only to have the customer elect to deal directly with the manufacturer, was inherent in the non-exclusive distributorship contract entered into between Infra-Pak and Carlson. The contract could have provided for some type of compensation for Carlson in that situation. It did not. Testimony of Infra-Pak's regional sales manager indicates that Infra-Pak does not pay finder's fees to distributors: "if it's a distributor, we only sell to them." It is clear, therefore, that the omission in the contract of some type of compensation for a distributor in Carlson's situation was intentional. I do not think that Texas law would permit Carlson to circumvent the compensation provisions of the existing contract and recover in quantum meruit. When we permit that recovery, we in effect rewrite the contract for the parties. Respectfully, I would decline to do that.

The kind of work that Carlson performed in this case is exactly the kind of work that a distributor does. It included an initial sales visit to Liberty Glass to sell an Infra-Pak stretch wrapping machine, follow-up telephone calls and sales visits to sell the same product and sales quotes on an Infra-Pak Spider Automatic 10 stretch wrapping machine. In my view, none of this work can be considered outside the scope of the contract; it falls clearly within Carlson's undertaking as a distributor of Infra-Pak products to use its best efforts to promote, market and sell those products.

I would reverse.